UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): **22-508, 17-1759(L), 17-1785, 17-1910, 17-2321**

Caption [use short title]: **USA v. William R. Cosme**

Motion for: **Vacate/Modify unlawful injunctions upon innocent property**

Set forth below precise, complete statement of relief sought:
- enforce irrevocable contractual rights
- return all innocent property restrained

MOVING PARTY: **William R. Cosme**
☐ Plaintiff  ☒ Defendant
☒ Appellant/Petitioner  ☐ Appellee/Respondent

OPPOSING PARTY: **USA**

MOVING ATTORNEY: **William R. Cosme**
Reg. No. 67795054
FCI Schuylkill
P.O. Box 759
Minersville, PA 17954

OPPOSING ATTORNEY: **AUSA Solowiejczyk**

Court-Judge/Agency appealed from: **Preska (LAP)**

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1)?
☒ Yes  ☐ No (explain):

Opposing counsel's position on motion:
☐ Unopposed  ☐ Opposed  ☒ Don't Know

Does opposing counsel intend to file a response:
☐ Yes  ☐ No  ☒ Don't Know

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:
Has request for relief been made below?  ☐ Yes  ☒ No
Has this relief been previously sought in this Court?  ☐ Yes  ☒ No
Requested return date and explanation of emergency: **ASAP urgent**

Is oral argument on motion requested?  ☒ Yes  ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☐ Yes  ☒ No  If yes, enter date:

Signature of Moving Attorney: *William R. Cosme*
Date: **4/13/22**
Service by: ☐ CM/ECF  ☒ Other [Attach proof of service]

Form T-1080 (rev. 12-13)

Emergency Motion Pg.(1)

USA
v.
William R. Cosme,
(appellant)

RECEIVED
2022 APR 20 PM 2:47
CLERK'S OFFICE
U.S. DIST. OF APPEALS

No. 13CR43 D.Ct.
* No. 22-508, 17-1759

Motion To Vacate, Modify injunctions
(CAFRA 2000 abuse)
present

   The appellant, CEO. desires to be represented by counsels of his choosing for the instant direct appeal, writs, sentencing remand, SCOTUS petitions, cross border investigations, Letter Rogatory, domestic and cross border parallel civil and criminal investigations intrinsic to the case at bar, Interlocutory Appeals, arbitration, bankruptcy inter alia all intrinsic to the case at bar.

<u>Law</u> — the appellant relies upon Second Circuit Black Letter law; U.S. v. Gotti, 155 F.3d 144 (2d. 1998) and Luis v. U.S. 136 S.Ct. 1083 (2016). A defendant like Mr. Cosme is entitled via the U.S. Constitution to use <u>their</u> assets to retain counsel when the gov. has not complied with the applicable laws and or to use any all <u>innocent</u> property to fund his criminal defenses; applicable here.

<u>Relief Sought</u> — issue a expedited/emergency order to cause return of any all innocent property unlawfully restrained forfeited pursuant to CAFRA 2000, in violation of CAFRA 2000 and the 4th Amendment. As this court is aware in connection

Pg.(1)

Interlocutory Appeal No. 14-1825, U.S. v. William R. Cosme, 796 F.3d 226 (2d. 2015) confirmed ~~that the~~ gov., D.Ct., law enforcement's non compliance to CAFRA 2000 in the context of civil, criminal, administrative asset forfeitures ongoing particularly 18 § USC 981, 28 § USC 2461 and 21 USC § 853 and the 4th, 5th, 6th and 8th Amendments. CAFRA 2000 under the circumstances since 2012 mandates the immediate return of Mr. Cosme's property. Additionally, Mr. Cosme is also entitled to property rights overlooked by the courts that are in the form of <u>irrevocable</u> contractual rights to: advance payments of attorney, legal fees, any all expenses, costs, damages, interest, reimbursements of accrued legal bills paid inter alia. Obviously if the court overlooked such an issue causing interference with counsel of choice and property rights at every phase (applicable here) than the bad-faith, unconstitutional conviction is void, again.
(overlooked) Since 2012
<u>Innocent Property and Property Rights</u> (contractual)
(CAFRA 2000 mandates immediate return of the property)

(1) - Lamborghini - (unlawfully forfeited)
(1) - Ferrari - (unlawfully forfeited)
(1) - Juke - (unlawfully forfeited)
(1) - Escalade - (unlawfully forfeited)
(1) - $4mm in fungible cash/stock - (unlawfully forfeited)
- $63K in U.S. Currency - (unlawfully forfeited)
- 30 lbs. of gold bars - unlawfully forfeited)
- contractual rights - see No. 13CR43 (LAP) Dkt. No. (174-1)

See contract Exhibit A No. 13CR43(LAP) Dkt. (174-)
See ECF pg. (12 of 19) for rights to expenditures
See ECF pg. (16 of 19) Attorneys' Fees, expenses
See ECF pg. (16 of 19) irrevocable POA
See ECF pg. (4 of 19) proof that TCIS is Mr. Cosme's employer obligated to pay any all Fees, expenses, interest, damages, appeals, injunctions inter alia

Relief Sought #2 - issue a court order compelling Mr. Cosme's employer TCIS pay any all expenses, Fees/Legal/Attorney, interest, damages, accrued Attorneys' Fees paid, advancement of fees inter alia. $100mm.+

Mr. Cosme relies upon U.S. v. Stein, 435 F. Supp 2d 330 (SDNY 2006) and U.S. v. Weissman, 1997 WL 334966 (SDNY June 16, 1997) for the above relief sought in #2.

## PRIVATE FUNDING AND SECURITY AGREEMENT

| | | | |
|---|---|---|---|
| **Private Funding Amount:** | US $55,000,000.00 | **Agreement Date:** | January 19, 2011 |
| **Purpose of Private Funding Proceeds:** | Construction Funding | Funding to build top quality education facilities which TCIS plans to complete in two phases: Phase 1 – $35,000,000.00 targeted for June 30, 2011, and Phase 2 – $20,000,000.00, targeted for December 31, 2012. | |
| **Borrower:** | Taejeon Christian International School | 210-1 Oh Jung Dong, Dae Duk Gu Daejeon City, Chong Chung Nam Do Republic of Korea | |
| **Funder:** | Cosmo Dabi International Trading Group, Inc. | 55 Wall Street New York, New York 10005 USA | |

THIS PRIVATE FUNDING AND SECURITY AGREEMENT is entered into between: Taejeon Christian International School (referred to below as "Borrower"); and Cosmo Dabi, Inc. (referred to below as "Funder").

### ARTICLE I — DEFINITIONS

The following words shall have the following meanings when used in this Agreement. Terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the appropriate Commercial Code of the jurisdiction. All references to dollar amounts shall mean amounts in lawful money of the United States of America.

**Agreement.** The word "Agreement" means this Private Funding and Security Agreement, as this Private Funding and Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Private Funding and Security Agreement from time to time.

**Borrower.** The word "Borrower" means Taejeon Christian International School, 210-1 Oh Jung Dong, Dae Duk Gu, Daejeon City, Chong Chung Nam Do, Republic of Korea ("TCIS").

**Funder.** The word "Funder" means Cosmo Dabi International Trading Group Inc., having a place of business at 55 Wall Street, New York, New York 10005.

**Promissory Note.** "Promissory Note" collectively means the note dated January 19, 2011, in the principal amount of Fifty-five Million and 00/100 Dollars ($55,000,000.00) from Borrower to Funder, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for the Promissory Note.

TCISLoanSecurityAgreement110119bpyt                                                                 Page 1 of 18

facilitate managed, matched buy/sell/trade finance strategies using private physical gold products, other commodities, automotive, investment grade financial instruments and or various other types of transactions from which the proceeds shall be used to generate the Private Funding Amount.

**Closing Date.** "Closing Date" shall mean such date that the Equity Deposit is received into the bank account designated by Funder per wiring instructions to be provided by Funder.

**Related Documents.** The words "Related Documents" mean and include without limitation all promissory notes, applications and agreements for letters of credit, loan agreements, guaranties, security agreements, mortgages, deeds of trust, filings with governmental authorities to establish and secure Funder's interest in the Collateral, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness and or this transaction.

### ARTICLE II — MANAGEMENT OF EQUITY DEPOSIT

Borrower hereby appoints and retains Funder as its fund manager ("Manager") – on the terms and conditions set forth herein for the Equity Deposit. Funder accepts such appointment and assumes responsibility for the fund management on the Closing Date, and agrees to manage and direct the Equity Deposit funds to generate the desired Private Funding Amount guaranteed upon all borrower qualifications and conditions being satisfactory to the Funder.

**Representations and warrant.** Borrower hereby represents and warrants that Borrower is a "Qualified Borrower" as defined at Rule 205-3 under the Investment Advisers Act of 1940 and other applicable definitions.

**Authority.** Manager shall accept the Equity Deposit into Cosmo Dabi International Trading Group Inc. bank account at JP Morgan Chase Bank, N.A. ("Account") per wiring instructions to be provided by Manager upon execution of this Agreement. Manager shall have full discretionary authority with respect to the investment of the Equity Deposit, when it deems appropriate, without prior consultation with or notification of Borrower, may act on behalf of Borrower in all matters whatsoever necessary or incidental to the servicing of the Equity Deposit and all transactions therein. Borrower will furnish Manager with all additional powers of attorney and other documentation and appoint Manager as agent and attorney-in-fact with respect to the Equity Deposit, but such powers shall not be construed to authorize Manager to take any action not authorized by this Agreement.

**Investments.** Manager shall enter into managed, matched buy/sell/trade finance strategies using private physical gold products, other commodities, automotive and investment grade financial instruments, and/or various other types of transactions from which the proceeds shall be used to generate the Private Funding Amount.

**Anti-Money Laundering Compliance.** Borrower acknowledges that Manager may require further information or representations from Borrower due to applicable anti-money laundering laws, regulations and such other obligations to which Manager may be subject, before Manager accepts Borrower's assets and opens an Account on behalf of Borrower. Such information may include, without limitation, further information or representation regarding the identification of Borrower and the source of its funds. Borrower agrees promptly to provide any information or representation deemed necessary by Manager, in its sole discretion, to comply with its anti-money laundering and other responsibilities from time to time.



Funder's address referred to above. If any payment is scheduled to become due and payable on a day which is not a Business Day, such payment shall instead become due and payable on the immediately following Business Day. Any payments not paid within ten calendar days of the Payment Due Date shall result in a late fee of two percent of each payment not paid and trigger and interest rate increase as described.

The proceeds of the private funding shall be distributed based upon the following draw schedule:

| Draw Schedule | Interest accruals are based upon draw down amounts and dates |
|---|---|
| $15,000,000 | First Draw to be disbursed 60 Business Days from the Closing Date, currently estimated to be no later than March 31, 2011. Borrower understands that March 31, 2011 may be adjusted based upon the Closing Date. If the First Draw is not disbursed by March 31, 2011, or as adjusted by the actual Closing Date, <br> i. Funder shall have an additional 15 international banking days grace to disburse the First Draw <br> ii. After which the private funding agreement automatically terminates, if mutually agreed upon <br> iii. Further, Funder agrees to return the Equity Deposit in full within seven (7) Business Days thereafter <br> iv. Unless Funder and TCIS mutually agree in writing to extend the First Draw disbursement date |
| $ 3,300,000 | Origination Points payable 60 Business Days from the Closing Date |
| $40,000,000 | Monthly or Quarterly draws per Schedule A attached |

## ARTICLE IV — CONDITIONS

The obligation of Funder to make the private funding as evidenced by the Promissory Note shall be subject to the fulfillment of the following conditions precedent on or before the date of such Promissory Note in a manner satisfactory to Funder:

**Funder shall have received the following:**

1. The Promissory Note, duly executed by Borrower.

2. The Related Documents, in form and substance satisfactory to Funder, duly executed by each person a party thereto.

3. Evidence satisfactory to Funder that Funder has full authorities and has been granted a perfected, first priority, un-subordinated, free and clear Lien in and to the Collateral. The Collateral must be 100% unencumbered, free and clear of any all liens and possess full, legal and rightful authority for use by the Funder as the underlying Collateral in exchange for the funding.

4. Landlord and mortgagee waivers, in form and substance satisfactory to Funder, duly executed by each lessor and lienholder of real property leased or owned by Borrower.



## ARTICLE VI — BORROWER'S COVENANTS, REPRESENTATIONS AND WARRANTIES

Borrower covenants, represents and warrants to Funder as follows:

**Power and Authority.** Borrower has the full right, power and authority to enter into this Agreement, to execute the Promissory Note and the Related Documents and to pledge the Collateral to Funder.

**Perfection of Security Interest.** Borrower authorizes Funder to file one or more financing statements and such other documents as Funder may require and to take whatever other actions as Funder may deem necessary to perfect and continue Funder's security interest in the Collateral. Upon request of Funder, Borrower will deliver to Funder any and all of the documents evidencing or constituting the Collateral, and Borrower will note Funder's interest upon any and all chattel paper if not delivered to Funder for possession by Funder. Borrower hereby appoints Funder as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue the security interest granted in this Agreement. Funder may at any time, and without further authorization from Borrower, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Borrower will reimburse Funder for all expenses for the perfection and the continuation of the perfection of Funder's security interest in the Collateral. Borrower promptly will notify Funder of any change in Borrower's name including any change to the assumed business names of Borrower. This Private Funding and Security Agreement will continue in effect until the Indebtedness is paid in full.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Borrower or to which Borrower is a party, and its partnership agreement, articles of incorporation or operating agreement, whichever is applicable, does not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of business, personal accounts, financial accounts, accounts in any shape or form, contract rights, chattel paper, or general intangibles, the Collateral is enforceable in accordance with its terms, is genuine, and complies with applicable laws concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Funder, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or theretofore shipped or delivered pursuant to a contract of sale, or for services theretofore performed by Borrower with or for the account debtor; there shall be no setoffs or counterclaims against any such account; and no agreement under which any deductions or discounts may be claimed shall have been made with the account debtor except those disclosed to Funder in writing.



**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Borrower's business, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Unless waived by Funder, proceeds from any disposition of the Collateral (for whatever reason), in an amount equal to the remaining Indebtedness, shall be held in trust for Funder and shall not be commingled with any other funds; provided however, this

1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 49 U.S.C. Section 6901, et seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing or intended to protect human health or the environment ("Environmental Laws"). The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous wastes and substances. Borrower hereby:

1. Releases and waives any future claims against Funder for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any Environmental Laws, and

2. Agrees to indemnify and hold harmless Funder against any and all claims and losses resulting from a breach of this provision of this Agreement, or as a result of a violation of any Environmental Laws and or political and or governmental actions as perceived by Funder. This obligation to indemnify shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Borrower shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Funder may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Funder and issued by a company or companies reasonably acceptable to Funder. Borrower, upon request of Funder, will deliver to Funder from time to time the policies or certificates of insurance in form satisfactory to Funder, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Funder and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Funder will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Funder holds or is offered a security interest, Borrower will provide Funder with such loss payable or other endorsements as Funder may require. If Borrower at any time fails to obtain or maintain any insurance as required under this Agreement, Funder may (but shall not be obligated to) obtain such insurance as Funder deems appropriate, including if it so chooses "single interest insurance," which will cover only Funder's interest in the Collateral.

**Application of Insurance Proceeds.** Borrower shall promptly notify Funder of any loss or damage to the Collateral. Funder may make proof of loss if Borrower fails to do so within fifteen (15) days of the casualty.

In the event any insurance proceeds become available due to loss or damage to the Collateral, said proceeds must first be applied to the repair, rebuilding, remedy, improvement or replacement of the condition of the Collateral and all damaged parts of the Collateral. Any unused or remaining amount of said insurance proceeds, if any, remaining after completion of said repairing, rebuilding, improvement or replacement shall be applied in the following manner:

1. First, toward the satisfaction of any existing defaults under the terms of this Agreement;

2. Second, as a prepayment on the principal balance of the Indebtedness secured by this Agreement with no such prepayment deferring the time for payment of any remaining payments required by this Agreement;

property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Borrower's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Funder is required by law to perfect Funder's security interest in such Collateral. Until otherwise notified by Funder, Borrower may collect any of the Collateral consisting of accounts receivables. At any time and even though no Event of Default exists, Funder may exercise its rights to collect the accounts receivables, designate the bank and or institution to hold the operating funds, and to notify account debtors to make payments directly to Funder for application to the Indebtedness. If Funder at any time has possession of any Collateral, whether before or after an Event of Default, Funder shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Funder takes such action for that purpose as Borrower shall request or as Funder, in Funder's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Borrower shall not of itself be deemed to be a failure to exercise reasonable care. Funder shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Collateral.

## ARTICLE IX — FUNDER'S EXPENDITURES

If any action or proceeding is commenced that would materially affect Funder's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement, the Promissory Note or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement, the Promissory Note or any Related Documents, Funder on Borrower's behalf may (but shall not be obligated to) take any action that Funder deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Funder for such purposes will then bear interest at the rate charged under the Promissory Note from the date incurred or paid by Funder to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Funder's option, will:

1. Be payable on demand;

2. Be added to the balance of the Promissory Note and be apportioned among and be payable with any installment payments to become due during either

    a. the term of any applicable insurance policy; or

    b. the remaining term of the Promissory Note; or

3. Be treated as a balloon payment, which will be due and payable at the Promissory Note's maturity.

The Collateral also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Funder may be entitled upon Default.

## ARTICLE X — EVENTS OF DEFAULT

Each of the following shall constitute an Event of Default under this Agreement:

## ARTICLE XI — RIGHTS AND REMEDIES ON DEFAULT

If an Event of Default occurs under this Agreement, at any time thereafter, Funder shall have all the rights of a secured party under the appropriate Commercial Code of the jurisdiction. In addition and without limitation, Funder may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Funder may declare the entire Indebtedness, including any prepayment penalty, which Borrower would be required to pay, immediately due and payable, without notice.

**Assemble Collateral.** Funder may require Borrower to deliver to Funder all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Funder may require Borrower to assemble the Collateral and make it available to Funder at a place to be designated by Funder. Funder also shall have full power to enter upon the property of Borrower to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower agrees Funder may take such other goods, provided that Funder makes reasonable efforts to return them to Borrower after repossession.

**Sell the Collateral.** Funder shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in its own name or that of Borrower. Funder may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Funder will give Borrower reasonable notice of the time after which any private sale or any other intended disposition of the Collateral is to be made unless Borrower has signed, after an Event of Default occurs, a statement renouncing or modifying Borrower's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Promissory Note rate from date of expenditure until repaid.

**Appoint Receiver.** Funder shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Funder's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Funder shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Funder, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Funder may at any time in its discretion transfer any <u>Collateral into its own name</u> or that of its nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the <u>Indebtedness</u> or apply it to payment of the Indebtedness in such order of preference as Funder may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper or similar property, Funder may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Funder may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Funder

principles). In arbitration, the prevailing party shall be awarded its legal fees and expenses, in addition to any other recovery in arbitration

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Funder's costs and expenses, including attorneys' fees and legal expenses, incurred in connection with the preparation or enforcement of this Agreement. Funder may pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Funder's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (and including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Multiple Parties; Corporate Authority.** If Borrower consists of more than one person or entity, all obligations of Borrower under this Agreement shall be joint and several, and all references to Borrower shall mean each and every Borrower. This means that each of the persons signing below as "Borrower" is responsible for all obligations in this Agreement. Where any one or more of the parties are corporations or partnerships or limited liability companies, it is not necessary for Funder to inquire into the powers of any of the parties or of the officers, directors, partners, managers, members or agents acting or purporting to act on their behalf.

**Notices.** All notices required to be given under this Agreement shall be given in writing and shall be effective when actually delivered or when deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown above. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. To the extent permitted by applicable law, if there is more than one Borrower, notice to any Borrower will constitute notice to all Borrowers. For notice purposes, Borrower agrees to keep Funder informed at all times of Borrower's current address(es).

**Power of Attorney.** Borrower hereby appoints Funder as its true and lawful attorney-in-fact, irrevocably, with full power of substitution to do the following:

1. to demand, collect, receive, receipt for, sue and recover all sums of money or other property which may now or hereafter become due, owing or payable from the Collateral;

2. to execute, sign and endorse any and all claims, instruments, receipts, checks, drafts or warrants issued in payment for the Collateral;

3. to settle or compromise any and all claims arising under the Collateral, and, in the place and stead of Borrower, to execute and deliver its release and settlement for the claim; and

4. to file any claim or claims or to take any action or institute or take part in any proceedings, either in its own name or in the name of Borrower, or otherwise, which in the discretion of Funder may seem to be necessary or advisable.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS LOAN AND SECURITY AGREEMENT, AND BORROWER AGREES TO ITS TERMS.  THIS AGREEMENT IS DATED January 19, 2011.

Borrower: Taejeon Christian International School

By: *[signature]*

Name:  Dr. Thomas Penland
Title:   Headmaster and Authorized Signatory

ACKNOWLEDGED AND AGREED:

Funder and Manager: Cosmo Dabi International Trading Group Inc.

By: *[signature]*

Name:  William R. Cosmo
Title:   President and CEO

# EXHIBIT B

equity is brought with respect hereto, Borrower shall pay Funder all expenses and costs, including, but not limited to, attorney's fees.

From time to time, without affecting the obligation of Borrower or the successors or assigns of Borrower to pay the outstanding principal balance of this Note and observe the covenants of Borrower contained herein without affecting the guaranty of any person, corporation, partnership or other entity for payment of the outstanding principal balance of this Note, without giving notice to or obtaining the consent of Borrower, the successors or assigns of Borrower or guarantors, and without liability on the part of Funder, Funder may, at the option of Funder, extend the time for payment of said outstanding principal balance or any part thereof, reduce the payments thereon, release anyone liable on any of said outstanding principal balance, or any part thereof, reduce the payments thereon, release anyone liable on any of said outstanding principal balance, accept a renewal of this Note, modify the terms and time of payment of said outstanding principal balance, join in any extension or subordination agreement, release any security given herefor, take or release other or additional security, and agree in writing with Borrower to modify the rate of interest or period of amortization of this Note or change the amount of the monthly installments payable hereunder.

This Note shall be governed by and construed in accordance with the laws of the State of New York and applicable federal law.

It is the intent of Borrower and Funder to conform to and contract in strict compliance with applicable usury laws from time to time in effect. All agreements between Funder and Borrower (or any other party liable with respect to any indebtedness under this Note) are hereby limited by the provisions of this paragraph which shall override and control all such agreements, whether now existing or hereafter arising and whether written or oral. In no way, nor in any event or contingency (including but not limited to prepayment, default, demand for payment, or acceleration of the maturity of any obligation), shall the interest taken, reserved, contracted for, charged or received under this Note or otherwise, exceed the maximum nonusurious amount permissible under applicable law. If, from any possible construction of any document, interest would otherwise be payable in excess of the maximum nonusurious amount, any such construction shall be subject to the provisions of this paragraph and such document shall be automatically reformed and the interest payable shall be automatically reduced to the maximum nonusurious amount permitted under applicable law, without the necessity of execution of any amendment or new document. If Funder shall ever receive anything of value which is characterized as interest under applicable law and which would apart from this provision be in excess of the maximum lawful amount, an amount equal to the amount which would have been excessive interest shall, without penalty, be applied to the reduction of the principal amount owing on the indebtedness evidenced hereby in the inverse order of its maturity and not to the payment of interest, or refunded to Borrower or any other payor thereof if and to the extent such amount which would have been excessive exceeds such unpaid principal. The right to accelerate maturity of this Note or any other indebtedness does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Funder does not intend to charge or receive any unearned interest in the event of acceleration. All interest paid or agreed to be paid to Funder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full stated term (including any renewal or extension) of such indebtedness so that the amount of interest on account of such indebtedness does not exceed the maximum nonusurious amount permitted by applicable law. As used in this paragraph, the term "applicable law" shall mean the laws of the State of New York or the federal

TCIS-CDIPromNote110119bpyt

laws of the United States, whichever laws allow the greater interest, as such laws now exist or may be changed or amended or come into effect in the future.

PRESENTMENT FOR PAYMENT, DEMAND, NOTICE OF NONPAYMENT OR NONPERFORMANCE, PROTEST, NOTICE OF PROTEST, NOTICE OF INTENT TO ACCELERATE, AND NOTICE OF ACCELERATION ARE HEREBY WAIVED BY BORROWER, ALL MAKERS, SECURITIES, GUARANTORS AND ENDORSERS HEREOF. THIS NOTE SHALL BE THE JOINT AND SEVERAL OBLIGATION OF BORROWER, ALL MAKERS, SURETIES, GUARANTORS AND ENDORSERS, AND SHALL BE BINDING UPON THEM AND THEIR SUCCESSORS AND ASSIGNS. BORROWER, AND ANY ENDORSERS, OR GUARANTORS HEREOF, SEVERALLY WAIVE AND RELINQUISH, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO THE BENEFITS OF ANY MORATORIUM, REINSTATEMENT, MARSHALING, FORBEARANCE, VALUATION, STAY, EXTENSION, REDEMPTION, APPRAISEMENT, EXEMPTION AND HOMESTEAD NOW OR HEREAFTER PROVIDED BY THE CONSTITUTION AND LAWS OF THE UNITED STATES OF AMERICA AND OF EACH STATE THEREOF, BOTH AS TO ITSELF AND IN AND TO ALL OF ITS PROPERTY, REAL AND PERSONAL, AGAINST THE ENFORCEMENT OF THE OBLIGATIONS EVIDENCED BY THIS NOTE OR BY THE OTHER LOAN DOCUMENTS.

FUNDER:

Cosmo Dabi International Trading Group Inc.

By: _____

William R. Cosmo

President and CEO


BORROWER:

Taejeon Christian International School

By: _____

Dr. Thomas Penland

Headmaster and Authorized Signatory

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

CAPTION:

USA v.

William R. Cosme

**CERTIFICATE OF SERVICE**
Docket Number: 17-1759, 17-1785, 17-1910, 17-2321, 22-508

I, William R. Cosme, hereby certify under penalty of perjury that on 4/13/22 ~~12/9/19~~ (date), I served a copy of Motion Info Sheet, COS Emergency Motion ~~Affidavit Rule 60~~ to vacate modify injunctions (list all documents) (~~notice of fraud on the~~ court/errors)

by (select all applicable)*

- [x] United States Mail
- [ ] Federal Express
- [ ] Overnight Mail
- [ ] Facsimile
- [ ] E-mail
- [ ] Hand delivery

on the following parties (complete all information and add additional pages as necessary):

| Name | Address | City | State | Zip Code |
|---|---|---|---|---|
| Noah Solowiejczyk | 1 St. Andrews Plaza | | 10007-1703 | |
| Name | Address | City | State | Zip Code |
| Name | Address | City | State | Zip Code |
| Name | Address | City | State | Zip Code |

4/13/22 ~~12/9/19~~
Today's Date

Sign your name William R. Cosme
Signature

*If different methods of service have been used on different parties, please indicate on a separate page, the type of service used for each respective party.

Certificate of Service Form

nple Format

William R. Cosme
Reg. No. 67795054
FCI Schuylkill
P.O. Box 759
Minersville, PA 17954

Legal Mail

Clerk of the Court c/o Ms. Lain
U.S. Court of Appeals
U.S. Courthouse
40 Foley Square
N.Y., N.Y. 10007

U.S.M.
SDNY



